## Case No. 724.

### BAETJER v. BORS.

[7 Ben. 280.] [1]

District Court, S. D. New York. April, 1874.

CHARTER—CLASSIFICATION OF VESSEL— PLEADING —CONTRACT AGAINST PUBLIC POLICY — DAMAGES —DEMURRAGE—SUNDAY—GOLD CONTRACT.

1. A vessel was chartered to H. B. in November, 1868, for a voyage from Philadelphia to Europe, with a cargo of petroleum oil. Before she had arrived at Philadelphia, H. B. transferred the charter, at an advance, to C. B., who agreed to perform its conditions, the agreement of transfer containing the words: "H. B. guarantees the vessel to be first class." On the 1st of April, 1869, H. B. notified C. B. that the vessel was then at Philadelphia, ready to load under the charter. The vessel at that time had no classification either in the English, French or American Lloyds. On the 6th of April, C. B. wrote to H. B. that he had found that the vessel was not first class, and that, therefore he must consider the charter cancelled. Some correspondence passed between the parties, and, on April 12th, H. B. wrote to C. B., enclosing a copy of a classification of the vessel, issued to her on April 9th, showing that she had been classed as first class by the American Lloyds, and claiming thus to have performed his guaranty. C. B. replied repeating that he considered the charter cancelled because the vessel was not first class when she was tendered to him on the 1st of April. The vessel lay out her lay days, and was then chartered by her master at a lower

---

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

rate of freight than was specified in the charter. The owners of the vessel sued H. B. and obtained judgment against him for damages for not loading the vessel under the charter. H. B. thereupon filed this libel against C. B., to recover damages for his not carrying out his agreement. The libel alleged that the notice to C. B. was given on or about the 31st of March, and also that C. B., though duly requested, refused to carry out the conditions of the charter. *Held*, that under the agreement between H. B. and C. B., it was necessary that the vessel should be actually classified;

2. That, H. B., might, under the libel, show a tender of the vessel at any other day, within the terms of the contract, than March 31st;

3. That, as C. B., did not set up any damage resulting to him because of the vessel's not having a classification when she was tendered on the 1st of April, and was not, therefore, in any different position on April 12th, from what he was on April 1st, H. B., must be held to have fully complied with his agreement on April 12th, and C. B., was then bound to have accepted the vessel;

4. That, as C. B., absolutely refused to accept the vessel, H. B., was not bound to keep her any longer in readiness, and it was immaterial whether she remained at Philadelphia during all the lay days mentioned in the charter;

5. That, whether the assignment of the charter at an increased rate was void as against public policy or not, the respondent could not avail himself of the defense because it was not set up in the answer;

6. That, H. B., was entitled to recover the damages sustained by him, by the breach of the agreement by C. B., on the 12th of April.

7. A reference being had to compute the damages, the commissioner reported, as damages:

The difference between the amount the ship was entitled to receive and the sum for which she was afterwards chartered...........................£341  9 6
The libellant's profits on the assignment of the charter party.................................................  98 12 0
Five per cent. for rechartering, and three per cent. brokerage, per barrel..............................  56  4 0
                                                        ————————
                                                         £496  5 6
Amounting in currency, on June 19th, 1869, to...  $3,280 19
Interest thereon to date of report.....................  1,157 57
Demurrage, 28 days, from May 22d, 1869, to June 19th, 1869.............................................  1,295 48
                                                        ————————
                                                         $5,733 24

The respondent excepted to the report: *Held*, that the decree awarded to the libellant the damages sustained by him, not the damages sustained by the master or owners of the vessel;

8. That, as their interest under the charter was not directly assigned to the libellant and the libel did not allege that he had paid the judgment recovered against him by the master, or had paid anything to the master or owners on account of damages sustained by them, the item of £341 9/6 must be rejected;

9. That, as to the item of profit on the charter, it did not appear how it was arrived at, and the report must be referred back for further information on that point;

10. That the item of £56 4 must be rejected, because it was damage sustained by the master or owners of the vessel, if by any one;

11. That, as to the demurrage, the libellant was not bound to keep the vessel in readiness for the respondent after the 12th of April, and could not claim demurrage without showing due diligence thereafter in rechartering;

12. That, at any rate, too many days were allowed, as Sundays were not excepted in the calculation;

13. That, as the contracts were in gold, the report should have been in gold dollars, and not in currency;

14. That the respondent could not have an advance in the price of oil from April 1st to April 12th taken into consideration, as the libellant was not bound to tender the ship on any particular day, and the answer said nothing of any such advance.

[In admiralty. Libel by Herman Baetjer against Christian Bors to recover damages for a failure to carry out an agreement to transfer a charter party. Interlocutory decree for libellant. Respondent excepted to the commissioner's report. Report overruled in part, and referred back for further proceedings.]

W. R. Beebe and H. R. Wing, for libellant.

G. H. Forster, for respondent.

BLATCHFORD, District Judge. On the 14th of November, 1868, at London, the agents of the master of the Russian barque Kaleva entered into a charter party, in writing, with the agents of Herman Baetjer, of New York, wherein the former contracted that the vessel should proceed to Philadelphia, and, after discharging her cargo, should there load, from the factors of the latter, a cargo of refined petroleum in barrels, and proceed therewith to Queenstown or Falmouth, for orders, and discharge at a port in the United Kingdom, or on the continent, between Havre and Hamburgh, on being paid, as freight, six shillings sterling per every 42 gallons gross gauge of barrels shipped, whether full, partly full, or empty; and ten per cent. additional, if ordered to the continent; and fifteen pounds sterling gratuity to the master; and, if ordered to a direct port of discharge, on signing bills of lading, the freight to be one sixpence less per barrel of petroleum; 40 running days, Sundays excepted, to be allowed for loading and discharging; the freighter to have the option of keeping the vessel ten days on demurrage, over and above the said laying days, at seven pounds sterling per day. On the 4th of January, 1869, the barque not having yet arrived at Philadelphia, Herman Baetjer, the libellant, entered into a written agreement with Christian Bors, the respondent, at New York, such agreement being signed by them and endorsed on the back of a copy of the said charter party, and being in these words: "For a proper consideration, the within charter is hereby transferred to Christian Bors, of New York, he agreeing to carry out all its conditions, and to pay H. Baetjer, or order, when vessel is loaded, the difference between the within chartered rate, and six shillings and three, if ordered from Cork to the United Kingdom, or six and nine, if ordered to the Continent, with sixpence off, if ordered to a direct port, all per 42 galls., with 5 per cent. primage. H. Baetjer agrees to pay the gratuity of (£15) fifteen pounds, and to place the vessel in one safe loading berth. H. Baetjer guarantees vessel to be first class."

The controversy in this suit arises on the foregoing last clause of this transfer of the charter party. It was at first written, before signature, thus: "H. Baetjer guarantees vessel to class 3-3 1-1." Before signature, the words "be first" were interlined between the word "to" and the word "class," and "3-3 1-1" was erased, by drawing the pen through it, but so as to be still visible. The paper was signed with such interlineation and such erasure thus visible.

The libel avers, that, the vessel having arrived at Philadelphia and discharged her cargo, the libellant was ready to place her in one safe loading berth; that the respondent, on or about the 31st of March, 1869, was notified thereof, and of her readiness to receive cargo; that the vessel continued ready to receive cargo, as required by the charter party, until after the expiration of the forty running days allowed for loading and discharging, and the ten days allowed for keeping the vessel on demurrage; that the respondent refused to load the vessel or to carry out the conditions of the charter party, and the agreement under which it was transferred to him; that, by reason thereof, the master of the vessel, after the expiration of the fifty days, was compelled to, and did, procure, at Philadelphia, a cargo for the vessel, from other parties, but at a much less rate of freight than that agreed to be paid by the terms of the charter party, with which cargo she afterwards proceeded to the continent of Europe; that, on the 31st of July, 1871, the master of the vessel, in a suit brought by him in this court, in admiralty, against the libellant in this suit, on the charter party, to recover damages for a breach of it by the libellant in this suit, such suit being brought in June, 1869, recovered a judgment against the libellant in this suit for $3,939 16 gold, and $50 currency, damages, and $151 67 costs, the respondent in this suit having been notified, at the time, of the commencement of such suit by said master, and invited to take part in defending it; that the libellant has expended, in disbursements and counsel fees in said action, $250, and has, by the refusal of the respondent to load the vessel, been otherwise damaged in the amount of $1,000; that the respondent has not paid said judgment or the damages sustained by the libellant by reason of the failure of the respondent to perform the agreement under which the charter party was transferred to him; and that the master of the vessel performed all the conditions of the charter party on his part to be performed, and the libellant performed all the conditions of the agreement by which the charter party was transferred, on his part to be performed. The libel claims to recover, as damages. $3,939 16 in gold, and $1,401 67 in currency.

The substance of the answer is, that the libellant, by the clause, in the instrument of transfer, guaranteeing the vessel to be first class, guaranteed her to be first class on ei-

ther Lloyds' Register of British and Foreign Shipping (commonly called the English Lloyds), or on Bureau Veritas, Registre International de Classification de Navires, (commonly called the French Lloyds), or on the American Lloyds' Register of American and Foreign Shipping (commonly called the American Lloyds); that, on the 1st of April, 1869, when the vessel had not obtained any certificate, and was not first class, but, on the contrary, had not been classified, and had no class on said English, French or American Lloyds, the libellant informed the respondent that the vessel was at Philadelphia, ready to receive cargo, and that the lay days would commence to count from the 1st of April, 1869; and that thereupon the respondent rescinded the agreement of January 4th, 1869. by reason of the breach of it by the libellant, in that the vessel was not first class on either the English, the French or the American Lloyds, but had no class whatever.

The transfer of the charter party to the respondent does not provide that the vessel shall be tendered to the respondent at or by any particular time. Nor is it set up in defence, that there was any improper or hurtful delay in tendering her to him. The parties are agreed that the words "first class" have reference to the classing of vessels by some one of the three Lloyds referred to. The libellant contends, that the import of the agreement is, that the vessel shall be such in character, to bind the defendant to accept the tender of her, that she would, when tendered, if then offered for classing to the three Lloyds, be classed by some one of them as first class, in its mode of classing; and not that she shall, when tendered, have been, in fact, classed by some one of them, by a classing still then in force, as first class, in its mode of classing. The respondent contends for this latter construction, and, still further, that the agreement extends to requiring that the libellant shall, with the tender of the vessel, present to the respondent a certificate from some one of the three Lloyds, of a subsisting classing of the vessel by it as first class. It appears that the object of such classing of vessels by the Lloyds is, that the insurance company to which the shipper of cargo by the vessel, or her owner, applies for insurance on such cargo or vessel, may have, in the record of the vessel, by a continuing and subsisting classing of her, on the books of the particular Lloyds, evidence and a guaranty, in such examination of her as is known to be made by the competent persons conducting the Lloyds, that she is of a certain class or character. Unless the vessel is recorded on the books of the Lloyds as being classed in a continuing and subsisting class, the fact that she is in a condition to be capable of being so classed is of no value, in the premises, to the insurance company or to the person applying for insurance. The record is the thing of value. It is not reasonable to con-

strue the agreement on the part of the libellant so as to relieve him from the duty of procuring the actual classing of the vessel and making of the record, and throwing that duty on the respondent. This is further shown by what transpired before the agreement of transfer was signed. The broker who negotiated the transfer by communicating directly with the parties, was told by the respondent that he would not take any vessel but such as was first class. Thereupon the broker, in drawing the agreement, drew it that the vessel was to class 3-3 1-1. That is a class of the French Lloyds, and is the first class therein. When the agreement, so drawn, was taken to the libellant, he informed the broker, that, although the vessel had been classed in the French Lloyds as 3-3 1-1 (and which fact he had communicated to the broker before the agreement was drawn), yet such class, being for a specified time, had expired, and all he would do would be to guarantee her to be first class. Thereupon the language was changed, as stated. I cannot but regard it as incumbent on the libellant to see that the vessel had a recorded classing as first class on the books of some one of the three Lloyds, in order to make it incumbent on the respondent to accept a tender of the vessel.

The respondent was duly notified, in writing, at New York, by the libellant, on the 1st of April, that the vessel was then at Philadelphia ready to receive cargo, and that the lay days would commence to count from that day. At that time the vessel had no recorded subsisting classing in any one of the three Lloyds. On the 6th of April, the libellant was informed by the respondent, by letter, that he had found that the vessel was not first class, and that, therefore, he must consider the charter as cancelled. On the 8th of April, the libellant informed the respondent, by letter, that the libellant adhered to his agreement guaranteeing the vessel to be first class, and would furnish evidence thereof, if required, and should consider the charter to be in full force, and added, that, while he had refused, in the instrument of transfer, to warrant the class of 3-3 1-1, he had guaranteed her to be first class, knowing of the intention of her master to have her reclassed in Philadelphia. This shows that the libellant regarded an actual classing procured by some other party than the respondent, as necessary to answer the guaranty that the vessel should be first class, and that the libellant was conscious that he had not yet fulfilled his agreement, and that he was willing to consider it a part of his agreement, to furnish, if required, evidence of such actual classing. In reply to the libellant's said letter of April 8th, the respondent informed the libellant, by letter, that he still refused to accept the charter, and had no interest in the vessel, and considered the charter cancelled, on the ground of the vessel's not being first class. In reply, the libel-

lant on the 9th of April, informed the respondent, by letter, that, if the respondent required any certificate, proving the vessel to be first class, as guaranteed, he would furnish the same to him. In reply, the respondent, on the 9th of April, informed the libellant, by letter, that, from the libellant's said letter of the 9th of April, he, the respondent must conclude that the vessel had a certificate of first class, when tendered to him ready for loading, on the 1st of April, and that, if the libellant could produce such certificate from one of the three Lloyds, not later than April 1st, he, the respondent, wished it to be sent to him, for inspection. In reply, the libellant, on the 10th of April, informed the respondent, by letter, that he had sent to Philadelphia for a copy of a certificate of classification, which was in the hands of the master of the vessel, and would transmit it to the respondent as soon as it should be received, and that, when he guaranteed the vessel to be first class, he was satisfied he should be able, at any time, when called upon, to prove his words by actual facts. On the 12th of April, the libellant wrote to the respondent thus: "In conformity with my note to you of the 10th inst., I now beg to hand you enclosed a copy of certificate of the Russian bark Kaleva's classification, rating A 1½, thereby verifying my guaranty, as per endorsement on charter party, since you have called upon me * * * to furnish the same." In reply, the respondent, on the same day, wrote to the libellant thus: "I received your letter of this day with enclosed certificate, which now is of no interest to me, as I informed you a week ago that I consider the charter of bark Kaleva cancelled, you being unable to furnish me with proofs of her being first class when the vessel was tendered to me April 1st, and you certainly could not expect me to wait twelve days before it would be decided if she would get a first class certificate or not." In reply, the libellant, on the 13th of April, informed the respondent, by letter, that he considered the charter of the vessel transferred to the respondent in full force, and should hold the respondent to the fulfilment of the same.

The certificate of classification which the libellant sent to the respondent on the 12th of April, was a certificate dated at Philadelphia, April 9th, 1869, issued by the American Lloyds, certifying that the bark Kaleva had been duly surveyed by a surveyor of the Society of American Lloyds, and found in good order and fit to carry dry and perishable goods, and would be entered in the American Lloyds' books, and classed A 1½ for one year from the date of survey. The date of the survey was April 9th, 1869, or a day or two before. It is shown that a vessel classed A 1½ in the American Lloyds is first class. The vessel remained at Philadelphia for fifty days after the 1st of April, and then her master chartered her to take a cargo of petroleum in barrels from Philadelphia

to Cronstadt, at a rate of freight from one shilling and nine pence to two shillings per barrel less than the rate specified in the charter party. She arrived safely at Cronstadt with her cargo.

The theory of the answer is, that, as the vessel had no first-class certificate on the 1st of April, when the libellant tendered the vessel, the respondent could and did rescind the agreement. It is true, that the libel avers that the notice to the respondent was given on or about the 31st of March, but it also avers that the respondent, although duly notified and requested, refused to carry out the conditions of the charter party or of the agreement of transfer. Under the libel, I think the libellant may show a tender of the vessel at any other day within the terms of the contract. As before remarked, no particular day is specified or limited by the contract; and the answer sets up no damage to the respondent by reason of his supplying the place of this vessel with another one, because of the failure of the libellant to have a recorded classing of the vessel on and by the 1st of April, when the tender was received, or any other damage to the respondent resulting from such failure, so as to show that the position of the defendant was different, by reason of such failure, on the 12th of April from what it was on the 1st of April, nor is there any evidence tending to show any such fact. On the whole case, I think it must be held that the libellant did not comply with his agreement until the 12th of April, when he sent the certificate to the respondent, but that he did fully comply with it on the 12th of April, and that the respondent was then bound to accept the vessel. As the respondent then absolutely refused to accept the vessel, the libellant was not bound to keep her longer in readiness, so that it is immaterial whether or not she remained at Philadelphia, ready for the respondent, for fifty days from the 12th of April.

It is urged, that the notice to the respondent was not a tender of the vessel, that the libellant did not place the vessel in a loading berth, and that the libellant did not pay the gratuity to the master. It was sufficient, the vessel being at Philadelphia, for the libellant to notify the respondent of that fact, and of the readiness of the vessel to receive cargo, and it was then for the respondent to designate the loading berth, and the libellant would then have been bound to put the vessel there, if it was a safe one. As to the gratuity, the libellant only relieved the respondent from paying it. The objection taken by the respondent, in the correspondence, concerned only the classing of the vessel, and no other objection was specified; and, when the difficulty as to the classing was remedied, the original notice remained and became operative as a tender on the 12th of April, in connection with the sending of the certificate and the insisting by the libellant on the continuance of the respondent's obligation.

As to the objection, that the assignment of the charter party at an advance on the charter rate was void, as against public policy, it is sufficient to say that the answer does not take that defence. Independently of this, I am not prepared to hold that such a contract as this, assigning a charter party, has about it any element of invalidity. See Story, Cont. (3d Ed.) § 547.

The libellant is entitled to an interlocutory decree, that he recover the damages sustained by him by the breach, by the respondent, of the agreement of January 4th, 1869, as a breach committed by him on and from the 12th of April, 1869, such damages to be ascertained by a reference. No directions are given as to the rule of damages, as it was not discussed at the trial. All other questions are reserved until the coming in of the report.

The reference ordered was thereafter held, and the commissioner reported as follows: "The original charter, with the assignment thereon, shows that the ship was to receive six shillings sterling for each cask of forty-two gallons, and, by the terms of the decision, the lay days were to commence on the 12th of April, 1869, and, by the terms of the charter party, 40 lay days expired on the 22d day of May, 1869.

| | |
|---|---|
| The difference between the amount the ship was entitled to receive, and the sum for which she was afterwards chartered is........ | £341 9 6 |
| The libellant's profit on the assignment of charter party.......... | 98 12 0 |
| Claim 5 per cent. for rechartering and 3 per cent. brokerage per barrel ...................... | 56 4 0 |
| | £496 5 6 |
| Amounting in currency, June 19th, 1869, to........................ | $3,280 19 |
| Interest thereon from June 19th, 1869, to July 4th, 1874........ | 1,157 57 |
| | $4,437 76 |
| Demurrage, 28 days, from May 22d, 1869, to June 19th, 1869, at £7 sterling per day, £196 0 0, amounting, in currency ($4 86 in gold to the £ sterling, and 36 % premium on gold, the basis of calculation), to............... | $1,295 48 |
| Total ..................... | $5,733 24." |

To this report the respondent excepted, in ten exceptions:

1. That the commissioner adopted an erroneous measure of damages, in that he allowed to the libellant not merely the damages sustained by him by the breach, by the respondent, of the agreement of January 4th, 1869, as a breach committed by him on and from the 12th of April, 1869, but other large sums for items of damages not sustained by the libellant.

2. That the commissioner allowed to the libellant the difference between the amount the ship was entitled to receive from the libellant, and the sum for which she was rechartered May 29th, 1869, at which date the market price for charters had fallen to four

shillings and three pence (at which rate per barrel she was then rechartered) from five shillings and sixpence, which was the rate on April 12th, 1869.

3. That the commissioner allowed to the libellant, as profit on the assignment of the charter party, £98 12 sterling, when the amount of such profit, after deduction of the gratuity of £15, which the libellant agreed to pay, was only £28 2 6 sterling.

4. That the commissioner allowed to the libellant 5 per cent. for rechartering, and 3 per cent. brokerage per barrel, £56 4 0.

5. That the commissioner allowed to the libellant, in currency, June 19th, 1869, $3,-280 19, when he should not have allowed him any greater sum than $137 50, in gold coin.

6. That the commissioner allowed for interest from June 19th, 1869, to July 4th, 1874, $1,157 57, when he should not have allowed any greater sum than $41 59, in gold coin.

7. That the commissioner allowed to the libellant demurrage.

8. That the commissioner allowed to the libellant, in the item of difference, £341 9 6, the sum of £241 13 11, which arose from the decline in the rate of petroleum charters from April 13th, 1869, to May 29th, 1869, and allowed, in the 28 days' demurrage, for 21 days after the vessel was rechartered, and while she was loading under such recharter.

9. That the commissioner erred in the computation of the difference between what the ship was entitled to receive and what she was afterwards rechartered for, and in the computation of the libellant's profit on the assignment of the charter party.

10. That the commissioner should have considered the consequences to the respondent by reason of the failure of the libellant to perform his guaranty until the 12th of April, 1869, in the advance in the price of oil from April 1st to April 12th, 1¼ cents per gallon, whereby it would have cost the respondent $3,600 more to purchase cargo for the Kaleva on the 12th of April than on the 1st of April.

BLATCHFORD, District Judge. The interlocutory decree was, that the libellant recover the damages sustained by him by the breach, by the respondent, of the agreement of January 4th, 1869, as a breach committed by him on and from the 12th of April, 1869. It did not award to the libellant a recovery for the damages sustained by the master or owners of the vessel by such breach. Their interest under the charter party was not directly assigned to the libellant, nor was it assigned to him indirectly, by the libellant's having paid the judgment recovered against him by the master of the vessel for breach of the charter party. The libel, after averring that the respondent refused to carry out the conditions of the charter party, and of the agreement under which it was transferred to him, avers, as damages, that, by reason thereof, the master of the vessel was compelled to procure a cargo at less freight

than that agreed to be paid by the terms of the charter party, and that such master recovered a judgment against the libellant for a breach of the charter party by the libellant, and that the libellant expended money in such suit, and had, by the refusal of the respondent to load the vessel, been otherwise damaged. The libel does not aver that the libellant has paid the judgment, or has paid anything to the master or owners of the vessel on account of any damages sustained by them. The libellant, therefore, has sustained no damages in respect of any difference between any amount the vessel was entitled to receive and any sum for which she was afterwards rechartered. The report does not state what amount the ship was entitled to receive. The charter party fixes the freight at so much per barrel, but does not specify the number of barrels, and the report does not state what number of barrels is taken as the basis of the calculation. Nor does the report state for what sum the vessel was afterwards chartered. But this becomes immaterial, as the whole item of £341 9 6 must be rejected.

The item of £56 4 0 must be rejected. The report does not state how it is made up, or how much the item for rechartering is, or on what sum the percentage for rechartering is calculated, or on how many barrels the brokerage is calculated. I infer that there is a mistake in calling this brokerage a percentage per barrel. It ought probably to be so many cents brokerage per barrel. But the libellant does not aver in his libel, or show, that he has paid the item, or any part of it. It is an item of damage sustained by the master or owners of the vessel, if by any one. For the same reason, the item for demurrage must be disallowed.

As to the demurrage, as the libellant was not bound to keep the vessel in readiness for the respondent, after his refusal, on the 12th of April, to accept her, so, as against the respondent, the libellant and the master of the vessel were bound to use all diligence in rechartering the vessel, and could in no event claim demurrage without showing such diligence and inability to charter the vessel. In any event, too many days were allowed, as Sundays were not excepted in the calculation in the report.

Of course, the calculation of interest in the report is erroneous; and, as the contracts were payable in gold, the report should have been for a sum in gold dollars, and not for a sum in currency.

There remains the item of £98 12 0 allowed in the report as profit on the assignment of the charter party.

How that item is made up does not appear. It is probably intended to be the difference, at so much per barrel on a given number of barrels, between the chartered rate and a rate deduced from the agreement of January 4th, 1869. Whatever the proper sum for such profit may be, the £15 gratuity, for

the reasons before given, should not be deducted from it. But it is impossible to make any decision as to the item until the report states how the item is arrived at.

The respondent, instead of excepting to the report, should have moved to send it back for ambiguity and uncertainty and insufficiency.

As to the 10th exception, the advance in the price of oil is not an element in the case, as the libellant was not bound to tender the vessel at any particular time, and the answer says nothing about any advance in oil.

The report is referred back for further proceedings in conformity with this decision.